JOHN H. LONG *et al.*

*v.*

JOSIAH LITTLE *et al.*

*Filed at Ottawa October 5, 1886.*

1. EVIDENCE—*proof of signature—opinions of witnesses as to genuineness.* Upon the question of the genuineness of a signature, the number of witnesses will not always control. In determining what weight shall be given to the testimony of a witness, his knowledge and means of information, and his honesty and intelligence, should all be considered.

2. Where a witness shows he was acquainted with a person in his lifetime, and his handwriting, and had seen him write, he will be competent to give his opinion as to the genuineness of a signature purporting to be that of such deceased person.

3. SAME—*indorsement of payment of interest on a note—admission.* An indorsement upon a note, in the handwriting of the maker, of the receipt of the interest thereon up to a given date, after which the interest should be eight per cent, if unexplained, is an admission that such note was in force at the time the indorsement was made. But if there is no proof *aliunde* of the payment of the interest, such indorsement will not be sufficient evidence to overcome the payee's written receipt of payment in full, and his admission that the maker was "square" with him.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Lee county; the Hon. WILLIAM BROWN, Judge, presiding.

Messrs. WILLIAM E. IVES & SON, Messrs. DIXON & BETHEA, and Mr. WILLIAM BARGE, for the appellants.

Messrs. EDSALL & EDSALL, and Mr. B. H. TRUSDELL, for the appellees.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by John H. and Sarah Long, to enjoin appellees, executors of the estate of Louis Clapp, deceased, from selling certain lands under a power of sale contained in a mortgage dated October 12, 1876, which

the complainants had executed to secure the payment of five certain promissory notes, amounting in the aggregate to the sum of $5800, and payable to Louis Clapp. The defendants to the bill, appellees here, put in an answer, in which the material allegations of the bill were denied. They also filed a cross-bill, in which they prayed for a decree of foreclosure of the mortgage dated October 12, 1876, which purported to have been given to secure the payment of said sum of $5800, and interest thereon. Upon the hearing, on the pleadings, and the evidence reported by the master in chancery, a decree was rendered dismissing the original bill and foreclosing the mortgage, as prayed for in the cross-bill.

Owing to the death of Clapp, the mortgagee, and the consequent disability of Long, the mortgagor, to testify in the case, many of the facts connected with the notes and mortgage in dispute are left in doubt and uncertainty, which, doubtless, would be made plain if both of the parties were here to testify. For several years prior to October, 1876, John H. Long and Louis Clapp had dealings together. In 1874, Long became embarrassed, and upon application of some of his creditors, he was adjudged a bankrupt. At this time he was indebted to Clapp in the sum of $6000, and interest, and to one Simon Badger in the sum of $778.66, and several years' interest. These sums were secured by mortgages on what was known as the "Long farm." This farm was sold by the assignee, subject to the mortgages, and bid in by F. A. Truman. Some time after the purchase he obtained a release of dower from Mrs. Long, and on the 9th day of October, 1876, he conveyed all his interest in the farm to Louis Clapp. Clapp also purchased the Badger mortgage, and several tax liens on the premises. These various conveyances to Clapp, through which the legal title became vested in him, it is claimed were made through an arrangement entered into between Long and Clapp. It is also claimed by Long that the farm was worth much more than the claims against it, and that Clapp agreed

with him to accept that portion of the farm lying west of the road, and $1000, which, as claimed, was paid in cash, in full payment of all claims he had upon the land, and that Clapp agreed to convey that portion of the land east of the road to Long. The conveyance was made by Clapp to Long, but it is claimed and alleged in the bill that Clapp feared proceedings might be instituted by the creditors of Long to reach the property, unless it should be made to appear that the lands east of the road, conveyed to Long, were in fact sold to him, and in order to give the transaction that appearance, the notes and mortgage for $5800, dated October 12, 1876, were executed by Long and delivered to Clapp,—that the notes and mortgage for $5800 were executed merely to indemnify Clapp against any loss he might sustain should Long's creditors deprive Clapp of the land west of the road, which, as alleged, had been conveyed to him in satisfaction of all his claims. The alleged arrangement between Clapp and Long was not established by the evidence. It seems quite evident, from all the facts connected with the transaction, that Clapp obtained a conveyance of the Long farm under some arrangement made between himself and Long. He retained that portion of the land west of the Binghampton and La Moille road, consisting of two hundred and fifty-one acres, on account of the indebtedness which he held against Long. It is also true that Clapp executed a conveyance to Long of that portion of the land east of the road. But the controverted question is, whether Clapp took and retained that portion of the Long farm west of the road, in satisfaction of his claim against Long. If he did, then the decree foreclosing the mortgage can not be sustained.

On the trial, the defendant read in evidence a receipt purporting to have been executed by Louis Clapp on the same day he conveyed the land east of the road to Long, and on the same day Long gave Clapp his notes and mortgage for $5800. The receipt read as follows:

"AMBOY, *October 13, 1876.*

"Received of John H. Long, $1000, in full payment of five certain notes, bearing even date with this receipt, amounting to $5800.                                           LOUIS CLAPP."

The genuineness of the receipt is disputed by appellees. The appellant introduced on the trial fourteen or fifteen witnesses who were acquainted with the handwriting of Clapp, and they testified that the receipt was executed by him. The appellees introduced six or seven witnesses, who gave it as their opinion that the signature to the receipt was not that of Louis Clapp. It is quite true, as suggested by appellees' counsel, that the number of witnesses upon a question of this character does not always control. The knowledge of a witness, and the means of knowledge,—his honesty and intelligence,—are all to be considered in determining what weight should be given to his evidence. The witnesses called by appellants were well acquainted with Louis Clapp. They had done business with him, had seen him write, and knew his handwriting. They were therefore well qualified to speak of the matter upon which they were called to testify, and as to the genuineness of the signature to the receipt. We are of opinion that the clear and decided preponderance of the evidence is, that Louis Clapp executed the receipt. That the receipt referred to the notes in controversy in this case, there can be no doubt. There were no other five notes bearing even date with the receipt, for the sum of $5800, in existence when the receipt was executed, and hence it could have reference to no other notes. Indeed, it is not pretended, from any quarter, that the receipt refers to other notes.

Whether the two hundred and fifty-one acres of land which Clapp retained was sufficient to cover his claims on the land, would depend, of course, upon the price which should be placed upon the property. The evidence fails to show a specific contract, under which a definite price was agreed upon

by the parties.  But there is evidence that the land Clapp
retained was worth $25 per acre, and it appears that when
he first offered it for sale he held the land at that price, and
subsequently, when he reduced the price to $20 and $18, and
offered to sell at that price, he declared to a number of per-
sons that the land had cost him much more than that amount.
From these facts, the inference may fairly be drawn that the
land was taken by Clapp at $25 per acre.  If this be true,
there would be no $5800 of indebtedness left after deducting
the amount which should be allowed for the two hundred and
fifty-one acres of land.  The counsel for the respective parties
do not agree as to the amount Clapp held against the land,
and we do not propose to enter into an itemized account of
the indebtedness; but it is apparent, from the evidence, that
the claims did not amount to $12,000, or any such sum, which
would be the case if the notes for $5800 represented a part
of the indebtedness, and were to be paid.

There is another strong fact in the case which strengthens
appellant's theory that the notes were never to be paid.  It
appears from the evidence, that on the 24th day of January,
1880, Long deposited in Little's bank, to the credit of Clapp,
$500, and in like manner $2000 on January 29, 1880.  The
evidence shows that $1000 of this money so paid by Long
to Clapp, belonged to the latter, as his share of the proceeds
of certain cattle which Long and Clapp held together, but the
$1500 was applied in payment of certain notes held by Clapp
against Long, which were secured by mortgage on real estate,
and were not then due.  At the time this money was paid, two
of the notes of October 12, 1876, then amounting to $1300,
were past due, and another note of $1000 was nearly due.  If
these notes of October 12, 1876, were to be paid, why, it may
be asked, did Clapp accept of Long, money in payment of
well secured paper not due, and permit the notes past due to
remain unpaid?  This is not the manner in which such busi-
ness is usually transacted by business men.  Clapp was a

money loaner, and, as his financial success demonstrates, was a successful business man. Is it reasonable to believe that when he held notes against a person, due, and others not due, he would accept payment of notes not due, and allow those that were due to stand, without any objection whatever? This is unreasonable, and may well be regarded as a fact tending to prove that the notes of October 12, 1876, were not to be paid.

There is also another fact which has an important bearing on the case. It was proven that Clapp stated, shortly after the payment of the money heretofore spoken of, that he and Long were "square." Why a remark of this character should be made, if Long, at the time, was still indebted to Clapp over $5000, would seem to need some explanation.

In opposition to the testimony tending to prove that these notes were not a binding obligation against Long, are two facts entitled to due consideration. First is the fact that the notes were found in the possession of Clapp, uncancelled, at his death. Second, on the back of the notes is an indorsement, in the handwriting of Long, as follows: "Received interest on the within note up to March 1, 1880; after that, eight per cent." This indorsement, in the handwriting of Long, unexplained, is an admission that the notes were in force at the time the indorsement was made; but is it sufficient to overcome the receipt, signed by Clapp, showing that the notes were cancelled, and all the other evidence introduced by appellant bearing on the question? We think not. There is no evidence in the record that any interest was paid on the notes at the time the indorsement was made. Indeed, we find no evidence whatever that any interest was ever, at any time, paid on the notes. No witness was present when the indorsement was made on the notes, and no living witness could explain that indorsement but Long, and his lips are closed by the statute, on account of the death of Clapp. Had the interest been paid annually on these notes, after they were

given, up to the time of Clapp's death, we would have no hesitation in holding that Long was bound to pay the notes according to their terms; but the indorsement made thereon, no interest having been paid, we do not regard as sufficient to overcome the case made by appellant that the notes were not binding on him.

The judgment of the Appellate Court, and the decree of the circuit court, will be reversed, and the cause remanded to the circuit court for further proceedings consistent with this opinion.

*Judgment reversed.*

SHELDON and SCHOLFIELD, JJ., dissenting.